# UNITED STATES DISTRICT COURT

# DISTRICT OF CONNECTICUT

JERRY BLOOM,                           :
     Plaintiff,                       :
                                      :
       -vs-                         :     Civil No.  3:05cv217 (PCD)
                                      :
TOWN OF STRATFORD, POLICE              :
OFFICER DAVID MULLANE, in his          :
Individual and Official Capacities,    :
     Defendants.                      :

## RULING ON MOTION FOR SUMMARY JUDGMENT

In his *pro se* Complaint, Plaintiff sets forth the following claims against the Town of Stratford (the "Town") and Officer David Mullane ("Mullane"): (1) violation of Article First, Sections 7 and 9 of the Connecticut Constitution, (2) violation of 42 U.S.C. section 1983, (3) malicious prosecution, (4) false arrest and imprisonment, (5) assault and battery, (6) invasion of privacy, (7) negligent infliction of emotional distress and (8) intentional infliction of emotional distress.  Plaintiff also alleges that the Town is obligated to indemnify Mullane pursuant to sections 7-465 and 7-101a of the Connecticut General Statutes.  Defendants move for summary judgment on the ground that there are no genuine issues of material fact and ask that judgment be entered in their favor on all counts.  For the following reasons, Defendants' Motion for Summary Judgment [Doc. No. 33] is **granted in part** and **denied in part**.

## I.    BACKGROUND

Examination of the complaint, affidavits, pleadings, Local Rule 56(c) statements, exhibits and supplemental materials accompanying the motion for summary judgment, and the responses thereto, disclose the following material facts.

On May 17, 2003, Plaintiff was in Booth Memorial Park (the "Park") in Stratford, Connecticut using a metal detector to prospect and subsequently dig into the ground. (Bloom Dep. at 17:16-18:23, June 7, 2005, Ex. B to Pl.'s Opp.)  On that same day, Plaintiff was told by Park personnel and Officer Mullane that digging in the park was not permitted, however, Plaintiff told Mullane that he would continue to dig in the Park. (Mullane Dep. at 23-24, Aug. 17, 2005, Ex. A to Pl.'s Opp.)  Based on these actions, Mullane issued Plaintiff an infraction for violation of § 152-10a of the Stratford code of ordinances, which prohibits the injuring of property in public recreational areas.[1]  (Mullane Dep. at 9:7-10:5; Bloom Dep. at 18:8-19.) Plaintiff testified at his deposition that Mullane "may have" told him on May 17, 2003 that he was not supposed to be using his metal detector in the Park, (Bloom Dep. at 20:23-21:2), and Mullane testified that "Fehini," a Park custodian, told Plaintiff not to use his metal detector in the Park again, (Mullane Dep. at 22:20-23:9).  Plaintiff contested the infraction in Connecticut Superior Court, however, he was found guilty of injury to property in violation of § 152-10a of the Stratford code of ordinances and a $99 fine was imposed.  Plaintiff subsequently appealed the trial court's decision to the Connecticut Appellate Court, which affirmed the decision. State v. Bloom, 86 Conn. App. 463, 861 A.2d 568 (2004), cert. denied, 273 Conn. 911, 870 A.2d 1081 (2005).

One issue on appeal was whether § 152-10a of the Stratford code of ordinances is unconstitutionally vague because it fails to define the term "ornamental lawn."  The Appellate Court held that § 152-10a was not unconstitutionally vague and found that the lawn in the Park is

---

[1]  Section 152-10a of the Stratford code of ordinances states in relevant part: "No person shall deface, remove, destroy or otherwise injure, in any manner whatsoever, any . . . ornamental lawn within any recreational area."

an "ornamental lawn." State v. Bloom, 86 Conn. App. at 470-71.  Central to the court's

conclusion were its findings that the lawn "contributes to the beauty of the park," and was cared

for, maintained, kept, mowed, manicured and watered. Id. at 470.

On October 17, 2003, one day after being found guilty by the trial court but prior to filing

an appeal, Plaintiff was again in the Park using his metal detector in a "swinging fashion,"

consistent with its designated use. (Bloom Dep. at 8:9-11.)  While Plaintiff was using his metal

detector in the Park, a Park volunteer approached Plaintiff and asked him to stop using the metal

detector.[2] (Id. at 10:8-11:24.)  The Stratford police were somehow notified,[3] and Officer Evan

Sarris was dispatched to the Park. (Sarris Dep. at 5: 11-16, Aug. 17, 2005, Ex. C to Pl.'s Opp.)

Mullane, upon hearing the transmission over the radio, also responded to the situation at the

Park.  When he arrived at the Park, Mullane observed Plaintiff using the metal detector,

determined that probable cause existed, arrested Plaintiff and charged him with a violation of

Connecticut General Statutes § 53a-182: Disorderly Conduct, a class C misdemeanor.[4] (Mullane

Dep. at 12-16.)

---

[2]    There is a question whether the person who approached Plaintiff was "Park personnel," as
Defendants assert, or a "park volunteer," as Plaintiff asserts.  The conflict will be resolved in
Plaintiff's favor, as Mullane's deposition testimony and the police report both refer to the
complainee, John Austin, as a Park volunteer. (Mullane Dep. at 12:8-9; Police Report, Oct. 17,
2003, Ex. E to Defs.' Mot. Summ. J.)

[3]    Defendants assert that a Park volunteer called the Stratford Police Department to report Plaintiff's
actions, (Defs.' Rule 56(a)(1) Statement ¶ 9 (citing Mullane Dep. at 11)), however, Plaintiff
contests this assertion, arguing that Defendants have not presented any evidence that a Park
employee or volunteer called the police on October 17, 2003, (Pl.'s Rule 56(a)(2) Statement ¶ 9
(citing Austin Dep. at 9)).  Mullane's police report states that Austin called the Stratford Police
Department to report that Plaintiff was in the Park with a metal detector, however, Austin denies
calling the police that day. (Austin Dep. at 9:2-5, Aug. 17, 2005, Ex. E to Pl.'s Opp.)

[4]    Connecticut General Statutes § 53a-182(a) provides, in pertinent part, that: "A person is guilty of
disorderly conduct when, with intent to cause inconvenience, annoyance or alarm, or recklessly
creating a risk thereof, such person: . . . (2) by offensive or disorderly conduct, annoys or interferes
with another person . . . ."

Plaintiff was in the Park, not in or near his car, when he was arrested. (Mullane Dep. at 12:21-24.)  After arresting Plaintiff, Mullane asked Plaintiff to identify his vehicle. (Bloom Dep. at 28:23-29:6; Mullane Dep. at 13:8-12.)  When Plaintiff refused to identify his vehicle, Mullane identified Plaintiff's vehicle by running the license plate numbers of the cars in the parking lot. (Bloom Dep. at 30:4-8; Mullane Dep. at 13:8-14:19.)  Upon identifying Plaintiff's vehicle in the lot, Mullane asked Plaintiff if his car was locked. (Bloom Dep. at 30:9-11.)  Plaintiff responded that one side was locked, but that the driver's side door does not lock. (Id. at 30:12-15.)  Mullane felt around Plaintiff's pants for his car keys, and then reached into Plaintiff's left front pants pocket and removed the keys. (Id. at 30:21-31:8.)  According to Mullane's police report, his intention in identifying Plaintiff's car was to secure the vehicle, however, upon obtaining Plaintiff's keys, he "checked the interior and trunk of the car," where he observed a knife under the passenger seat of the car, and another knife, a pick axe and some "digging tools" in the trunk. (Police Report at 2, Oct. 17, 2003, Ex. E to Defs.' Mot. Summ. J.; Bloom Dep. at 31:18-24.) Mullane did not remove any items from the car. (Bloom Dep. at 32:17-18.)  After searching the vehicle, Mullane used Plaintiff's keys to secure his vehicle. (Police Report at 2.)  Mullane testified that he "went through [Plaintiff's] vehicle to secure [it] and just to do a quick inventory to look through [Plaintiff's] car and secure it." (Mullane Dep. at 19:24-20:2.)  Mullane did not have a search warrant to search Plaintiff's vehicle and Plaintiff did not consent to the search. (Sarris Dep. at 10:5-7; Mullane Dep. at 14:20-22, 20:7-11.)    Mullane also searched Plaintiff's person by patting him down after arresting him. (Mullane Dep. at 20:18-21:4.)  Mullane testified that he patted Plaintiff down "for my safety." (Id. at 20:6.)

Stratford Police Department Detective Nelson Dinihanian also went to the Park on

October 17, 2003 after hearing a call on the radio that there was some kind of disturbance there. (Dinihanian Dep. at 4:24-5:10, Jan. 27, 2006, Ex. D to Pl.'s Opp.)  Plaintiff was already in police custody when Dinihanian arrived. (Id. at 5:13-24.)  Plaintiff was not informed of his Miranda rights at the Park; Mullane informed him of his rights when they arrived at the police station. (Mullane Dep. at 13:18-14:4.)

Mullane spoke with John Austin, a Park volunteer and the "complainee," sometime after he arrived at the Park.[5] (Mullane Dep. at 14:23-16:2.)  Dinihanian also spoke with Mr. Austin that day, who told him that Plaintiff had been to the Park on several other occasions and that every time Plaintiff was there, the Park volunteers tried to "keep on eye on [him] because they felt that when [Plaintiff] was there[,] there was always some kind of damage done to the park." (Dinihanian Dep. at 8:21-9:6.)  It is undisputed that Plaintiff was not digging holes nor causing damage to the Park on October 17, 2003.  The disorderly conduct charge arising out of Plaintiff's October 17, 2003 arrest was ultimately nolled. (Bloom Dep. at 37:13-41:8.)

As a result of his arrest, Plaintiff was handcuffed, searched, booked, fingerprinted, had to post a $250 bond, had his metal detector confiscated for seven months, and had to go to court several times. (Id. at 33:24-34:4, 36:3-15, 37:13-41:8, 42:10-15.)  Plaintiff testified in his deposition that as a result of Defendants' actions, he suffered insomnia, anxiety, heartburn and

---

[5]     The parties dispute whether Mullane spoke with Mr. Austin before or after arresting Plaintiff. (See Defs.' Rule 56(a)(1) Statement ¶ 11 (citing Mullane Dep. at 12); Pl.'s Rule 56(a)(2) Statement ¶ 11 (citing Mullane Dep. at 14-18).)  Mullane's testimony at his deposition does not indicate when he spoke with Mr. Austin, however, Mullane does state that Plaintiff was not arrested based on the statement Mr. Austin gave that day. (Mullane Dep. at 14:23-15:22.)  This is contrary to Defendants' assertion that Mullane determined that probable cause to arrest Plaintiff based, in part, on his conversation with "Park personnel." (Defs.' Rule 56(a)(1) Statement ¶ 11.)  The police report, however, states that Austin called the police department to report Plaintiff's conduct and reported that "he has had to repair damage around the park due to someone digging," and that Plaintiff "is observed in the park when damage occurs." (Police Report at 2.)

anger. (Id. at 51:23-52:7.)  Plaintiff has not, however, received any medical attention for these alleged injuries. (Id. at 51:15-22.)

Plaintiff filed his Complaint in Connecticut state court in January 2005 and Defendants removed the case to this Court on February 3, 2005.

## II.    STANDARD OF REVIEW

Summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). No genuine issue of material fact exists and summary judgment is therefore appropriate when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 69, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986). A material fact is one which "might affect the outcome of the suit under the governing law" and an issue is genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Importantly, however, "[c]onclusory allegations will not suffice to create a genuine issue." Delaware & H.R. Co. v.Conrail, 902 F.2d 174, 178 (2d Cir. 1990).

The moving party bears the burden of establishing that summary judgment is appropriate, Anderson, 477 U.S. at 225, however, when moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant can satisfy its burden of establishing that there is no genuine of material fact in dispute by pointing to an absence of evidence to support an essential element of the non-moving party's claim. Celotex Corp. v. Catrett, 477 U.S.

6

317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). "A defendant need not prove a negative when it moves for summary judgment on an issue that the plaintiff must prove at trial. It need only point to an absence of proof on the plaintiff's part, and, at that point, plaintiff must 'designate specific facts showing that there is a genuine issue for trial.'" Parker v. Sony Pictures Entm't, Inc., 260 F.3d 100, 111 (2d Cir. 2001) (quoting Celotex, 477 U.S. at 324); see also Gallo v. Prudential Residential Servs. Ltd. P'ship, 22 F.3d 1219, 1223-24 (2d Cir. 1994) ("The moving party may obtain summary judgment by showing that little or no evidence may be found in support of the nonmoving party's case.") The non-moving party, in order to defeat summary judgment, must then come forward with "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Anderson, 477 U.S. at 249. In making this determination, the Court draws "all factual inferences in favor of the party against whom summary judgment is sought, viewing the factual assertions in materials such as affidavits, exhibits, and depositions in the light most favorable to the party opposing the motion." Rodriguez v. City of N.Y., 72 F.3d 1051, 1060 (2d Cir. 1995) (citations omitted). However, a party opposing summary judgment "may not rest upon the mere allegations or denials of the adverse party's pleading." Fed. R. Civ. P. 56(e).

Determinations of the weight to accord evidence or assessments of the credibility of witnesses are improper on a motion for summary judgment as such are within the sole province of the jury. Hayes v. N.Y. City Dep't of Corr., 84 F.3d 614, 619 (2d Cir. 1996). "If reasonable minds could differ as to the import of the evidence . . . and if . . . there is any evidence in the record from any source from which a reasonable inference in the nonmoving party's favor may be drawn, the moving party simply cannot obtain a summary judgment." R.B. Ventures, Ltd. v.

Shane, 112 F.3d 54, 59 (2d Cir. 1997) (internal citations omitted); see also Sologub v. City of New York, 202 F.3d 175, 178 (2d Cir. 2000) ("When reasonable persons applying the proper legal standards could differ in their responses to the questions raised on the basis of the evidence presented, the question is best left to the jury.").

Where, as here, the plaintiff is proceeding *pro se*, he is granted additional deference. See Haines v. Kerner, 404 U.S. 519, 520, 92 S. Ct. 594, 30 L. Ed. 2d 652 (1972) (holding the allegations of a *pro se* complaint to "less stringent standards than formal pleadings drafted by lawyers")

## III. DISCUSSION

### A. Counts One Through Six Against Defendant Mullane

Count One of Plaintiff's Complaint alleges that Defendant Mullane violated article first, sections 7 and 9 of the Connecticut Constitution by unlawfully detaining Plaintiff, arresting him without probable cause and without a warrant, searching Plaintiff's vehicle without probable cause and without a warrant, reaching into Plaintiff's pants pocket to obtain his car keys, and charging Plaintiff with disorderly conduct.

Count Two of Plaintiff's Complaint asserts a violation of 42 U.S.C. § 1983, alleging that Defendant Mullane: (1) unlawfully seized and arrested Plaintiff without a warrant and without probable cause, in violation of the Fourth and Fourteenth Amendments to the United States Constitution; (2) unlawfully searched Plaintiff's person and possessions without a warrant and without probable cause, in violation of the Fourth and Fourteenth Amendments; and (3) deprived Plaintiff of his liberty without due process of law when Plaintiff was taken into custody and not properly notified of his Miranda rights, in violation of the Fifth and Fourteenth Amendments.

Count Three sets forth a state law claim of malicious prosecution, alleging that Defendant Mullane caused the disorderly conduct charge to be brought against Plaintiff without probable cause, and Count Four sets forth a state law claim for false arrest and imprisonment, alleging that Defendant Mullane arrested Plaintiff without probable cause.  Count Five sets forth a state claim for assault and battery and Count Six sets forth a state law invasion of privacy claim, both premised on the allegation that Officer Mullane offensively touched Plaintiff and invaded his privacy when he reached into Plaintiff's pants pockets to obtain a Plaintiff's car keys without his consent.

1.    False Arrest

The elements of a § 1983 claim for false arrest are controlled by state law.[6] Davis v. Rodriguez, 364 F.3d 424, 433 (2d Cir. 2004); Cook v. Sheldon, 41 F.3d 73, 79 (2d Cir. 1994). Under Connecticut law, an absence of probable cause is an essential element of a false arrest claim. Davis, 364 F.3d at 433; McHale v. W.B.S. Corp., 187 Conn. 444, 447, 446 A.2d 815 (1982). Moreover, it appears that Connecticut law "place[s] the overall burden of proving the absence of probable cause on the false arrest plaintiff."[7] Davis, 364 F.3d at 433 (citing Beinhorn v. Saraceno, 23 Conn. App. 487, 491, 582 A.2d 208 (1990); Doe v. Bridgeport Police Dep't, 198 F.R.D. 325, 335 (D. Conn. 2001) (recognizing and citing Beinhorn)).

---

[6]    Because the same law applies to both claims, Plaintiff's false arrest claims arising under state law and § 1983 will be analyzed together.

[7]    As the Davis court notes, the specific question of whether the plaintiff or defendant in a § 1983 false arrest case bears the overall burden of proof with regard to probable cause, i.e., whether it should be treated as an element of the plaintiff's case or as a common law defense, has not been squarely decided. Davis, 364 F.3d at 434 n.8. Although the Davis court declined to decide the issue, see id., it appears that cases applying Connecticut law have placed the burden of proving an absence of probable cause on the plaintiff. See, e.g., Ruggiero v. Krzeminski, 928 F.2d 558, 562-63 (2d Cir. 1991) (assuming in a § 1983 warrantless search claim arising in Connecticut that the plaintiff bore the burden of proving the absence of exceptions to the warrant requirement).

The arresting officer has probable cause to arrest when "(1) police have 'knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed,' (2) 'by the person to be arrested.'" Cuba-Diaz v. Town of Windham, 274 F. Supp. 2d 221, 229 (D. Conn. 2003) (quoting Golino v. City of New Haven, 950 F.2d 864, 870 (2d Cir. 1991)).  In determining whether probable cause exists pursuant to this objective standard, district courts must look to the "totality of the circumstances," examining those facts available to the arresting officer at the time of the arrest and immediately before it. Caldarola v. Calabrese, 298 F.3d 156, 162 (2d Cir. 2002) (quoting Illinois v. Gates, 462 U.S. 213, 233, 76 L. Ed. 2d 527, 103 S. Ct. 2317 (1983)). "[P]robable cause can exist even where it is based on mistaken information, so long as the arresting officer acted reasonably and in good faith in relying on that information." Bernard v. United States, 25 F.3d 98, 102 (2d Cir. 1994).  Moreover, an officer need not eliminate every plausible claim of innocence before making an arrest. Caldarola, 298 F.3d at 167-68; see also Ricciuti v. New York City Transit Auth., 124 F.3d 123, 128 (2d Cir. 1997) (holding that "once a police officer has a reasonable basis for believing there is probable cause, he is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest").

Whether probable cause existed is a question that may be resolved as a matter of law on a motion for summary judgment if there is no dispute with regard to the pertinent events and knowledge of the officer. See Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996). To satisfy his burden and establish that he had probable cause, Defendant Mullane must demonstrate that in procuring Plaintiff's arrest he had a quantum of evidence "more than rumor, suspicion, or even strong reason to suspect." United States v. Fisher, 702 F.2d 372, 375 (2d Cir. 1983).

There is a question of fact here as to whether Defendant Mullane had probable cause to arrest Plaintiff.  Although Plaintiff had been found guilty of injury to property, the evidence presented does not show that he was under an order to stop metal detecting at the Park.[8]  The use of metal detectors is not prohibited in Connecticut, and Defendant Mullane conceded at his deposition that he was unaware of any law banning the use of metal detectors. (Mullane Dep. at 25:12-19.)  It is undisputed that on the day of his arrest, Plaintiff was not digging holes, nor causing damage to the Park  Defendant Mullane observed Plaintiff metal detecting and on that basis alone, decided to arrest him.

Other facts alleged by Plaintiff support this conclusion.  Officer Sarris, the responding officer, did not witness Plaintiff committing disorderly conduct when he arrived at the Park. (Sarris Dep. at 7:20-22.)  Although Sarris felt that the arrest was justified, he based that conclusion solely on the information provided to him by Mullane, who arrived at the Park shortly after Sarris did. (Id. at 8:2-9.)  Moreover, Plaintiff testified at his deposition that shortly after Mullane's arrival and prior to speaking with Mr. Austin, Mullane called Plaintiff over and Plaintiff complied by walking over to where Mullane was standing, at his patrol car. (Bloom Dep. at 14:24-15:11.)  Mullane ordered Plaintiff to cease prospecting, and Plaintiff complied by turning off his metal detector. (Id. at 15:18-16:10.)  It was at that time that Mullane placed Plaintiff under arrest.  Bessie Burton, curator and director of volunteers at the Park, testified at Plaintiff's November 21, 2003 trial that she "didn't care" if Plaintiff was using a metal detector in the Park, but that "[d]igging the holes is another matter." (Trial Trans. at 16:5-9, Nov. 21,

---

[8]     Mullane testified only that "Fehini," one of the Park custodians, informed Plaintiff on May 17, 2003 not to use his metal detector in the Park again. (Mullane Dep. at 22:20-23:9.)

2003, Ex. H to Pl.'s Opp.).  Ms. Burton indicated that other people use metal detectors at the Park, and if they start digging holes, are merely asked to leave. (Id.)

The evidence required to establish probable cause exceeds mere suspicion, but "is substantially less than that required for conviction." State v. Dennis, 189 Conn. 429, 431, 456 A.2d 333 (1983).  There is very little evidence, however, that Mullane believed that Plaintiff, "by offensive or disorderly conduct," was "annoy[ing] or interfer[ing] with another person." Conn. Gen. Stat. § 53a-182.  Mr. Austin, cited by Defendants as the complainant, denied calling the police, and Mullane testified at his deposition that his decision to arrest Plaintiff was not based on any information provided by Mr. Austin.  Mullane has not shown that the quantum of evidence before him when he made the decision to arrest Plaintiff constituted "more than rumor, suspicion, or even strong reason to suspect." Fisher, 702 F.2d at 375.  Based on Plaintiff's version of events, and construing the facts in Plaintiff's favor, there remains a question of fact as to whether Mullane had probable cause to arrest Plaintiff.

Even if a police officer lacks probable cause to arrest, however, he is entitled to qualified immunity from a § 1983 suit for damages if there is "arguable probable cause" to arrest, i.e., if it was reasonable to believe that there was probable cause or if officers of reasonable competence could disagree as to the existence of probable cause. Escalera v. Lunn, 361 F.3d 737, 743 (2d Cir. 2004).  According to Escalera, "the analytically distinct test for qualified immunity is more favorable to the officers than the one for probable cause; 'arguable probable cause' will suffice to confer qualified immunity for the arrest." Id.  For the same reasons as those set forth above, however, the Court finds that there remains a question of fact whether Mullane had probable cause, or even "arguable probable cause," to arrest Plaintiff.  A jury is entitled to examine the

facts and weigh the evidence to determine whether probable cause or arguable probable cause was present when Plaintiff was arrested.

Accordingly, summary judgment is not appropriate on Plaintiff's false arrest claim pursuant to § 1983 (Count Two), nor on Plaintiff's false arrest claim arising under state law (Count Four).

2.    Malicious Prosecution

In Count Three of his Complaint, Plaintiff also brings a state law claim of malicious prosecution against Defendant Mullane.  Under Connecticut law, the tort of malicious prosecution is the groundless institution of criminal proceedings against the plaintiff.  McHale v. W.B.S. Corp., 187 Conn. 444, 447, 446 A.2d 815 (1982).  To prove malicious prosecution Plaintiff must show that: (1) Mullane initiated or procured the institution of criminal proceedings against Plaintiff; (2) the criminal proceedings were terminated in favor of Plaintiff; (3) Mullane acted without probable cause and (4) Mullane acted with malice, primarily for a purpose other than bringing the offender to justice. Id.; see also Heck v. Humphrey, 129 L. Ed. 2d 383, 114 S. Ct. 2364, 2372 (1994) (holding that in order to recover damages for an unconstitutional conviction or imprisonment, a § 1983 plaintiff must demonstrate that "the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus"); Inkel v. Conn. Dep't of Children & Families, 421 F. Supp. 2d 513, 522 (D. Conn. 2006) ("In a malicious prosecution or vexatious litigation action, it is necessary to prove want of probable cause, malice and a termination of the suit in the plaintiffs' favor.").

13

The first two elements being without question,[9] Defendants argue only that Defendant

Mullane acted with probable cause.  This Court has found, however, that there is a question of

fact as to whether probable cause existed.  Moreover, since Defendants did not brief the issue,

there remains a question of fact as to whether malice existed.  As such, summary judgment will

not be granted on Plaintiff's malicious prosecution claim (Count Three).

_____3.     Unreasonable Search and Seizure

Plaintiff also alleges that he was unlawfully searched and seized by Defendant Mullane

without probable cause, and in violation of article first, sections 7[10] and 9[11] of the Connecticut

Constitution,[12] the Fourth and Fourteenth Amendments to the United States Constitution, and his

right to privacy.  Plaintiff also contends that Defendant Mullane's actions constituted assault and

battery.

a.     *Search of Plaintiff's Person*

In United States v. Robinson, 414 U.S. 218, 94 S. Ct. 467, 38 L. Ed. 2d 427 (1973), the

Supreme Court set forth a straightforward rule governing searches incident to an arrest, holding

that "in the case of a lawful custodial arrest a full search of the person is not only an exception to

---

[9]      The Connecticut Supreme Court, in See v. Gosselin, 133 Conn. 158, 160-61, 48 A.2d 560 (1946), held that a nolle constituted a "termination in favor of the accused" and therefore is sufficient grounds on which to bring a malicious prosecution action.

[10]     The Connecticut constitution, article first, § 7, provides: "The people shall be secure in their persons, houses, papers and possessions from unreasonable searches or seizures; and no warrant to search any place, or to seize any person or things, shall issue without describing them as nearly as may be, nor without probable cause supported by oath or affirmation."

[11]     The Connecticut constitution, article first, § 9, provides: "No person shall be arrested, detained or punished, except in cases clearly warranted by law."

[12]     The Connecticut Supreme Court, in Binette v. Sabo, 244 Conn. 23, 710 A.2d 688 (1998), created a private right of action for damages for violations of article first, sections 7 and 9 of the Connecticut Constitution. See id. at 25-26, 49.

14

the warrant requirement of the Fourth Amendment, but is also a 'reasonable' search under that Amendment." Id. at 235.  The authority to conduct such a search is "based upon the need to disarm and to discover evidence," and "does not depend on what a court may later decide was the probability in a particular arrest situation that weapons or evidence would in fact be found upon the person of the suspect." Id.  Because, however, this Court has found that there is a question of fact as to whether Plaintiff's arrest was based upon probable cause, it follows that there is also a question of fact as to whether the search of Plaintiff's person was reasonable. As such, summary judgment is denied on Counts One, Two and Six to the extent that they are predicated on the search of Plaintiff's person.

> b.      Search of Plaintiff's Car

In Chimel v. California, 395 U.S. 752, 89 S. Ct. 2034, 23 L. Ed. 2d 685 (1969), the Supreme Court held that when an officer has conducted a lawful custodial arrest, that action justifies the contemporaneous search, without a warrant, of the person arrested and of the immediately surrounding area. Id.; see also State v. Delossantos, 211 Conn. 258, 266-67, 559 A.2d 164 (1989) (holding that "when police make a lawful custodial arrest of an occupant of an automobile, and the arrestee is detained at the scene, police may contemporaneously search without a warrant the interior passenger compartment of the automobile").  Such searches are considered valid because of the need "to remove any weapons that [the person being arrested] might seek to use in order to resist arrest or effect his escape" and the need to prevent the concealment or destruction of evidence. Chimel, 395 U.S. at 763.  In such a situation, the "scope of [the] search must be 'strictly tied to and justified by' the circumstances which rendered its initiation permissible." Id. at 762 (quoting Terry v. Ohio, 392 U.S. 1, 19, 88 S. Ct. 1868, 20 L.

Ed. 2d 889 (1968)).

The Supreme Court has also noted that "[l]ocal police officers . . . frequently . . . engage in what . . . may be described as community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." Cady v. Dombrowski, 413 U.S. 433, 441, 93 S. Ct. 2523, 37 L. Ed. 2d 706 (1973). These caretaking functions, designed to secure and inventory a vehicle's contents, developed in order to (1) protect the owner's property; (2) protect the police from claims of lost or stolen property; and (3) protect the police from potential danger. South Dakota v. Opperman, 428 U.S. 364, 369, 96 S. Ct. 3092; 49 L. Ed. 2d 1000 (1976) (citations omitted). These caretaking procedures have been upheld by the Connecticut Supreme Court, which held that even if the inventory is classified as a "search," the intrusion is constitutionally permissible. State v. Tully, 166 Conn. 126, 136, 348 A. 2d 603 (1974).

As it is not clear whether the arrest itself was lawful, the automobile search at issue here cannot be deemed legitimate—on summary judgment—as a search incident to arrest. See Gustafson v. Florida, 414 U.S. 260, 266, 94 S. Ct. 488; 38 L. Ed. 2d 456 (1973) ("it is the fact of custodial arrest which gives rise to the authority to search"). There are several factors present, however, which bring the police conduct herein within the "community caretaking function" principle enunciated in Cady v. Dombrowski. First, "there is no evidence that this was a general exploratory search on the part of the policeman on the pretext of protecting [Plaintiff's] property although in fact related to the processes or objectives of the criminal law." State v. Tully, 166 Conn. 126, 136, 348 A.2d 603 (1974). Second, Plaintiff had informed Mullane that his vehicle was unlocked and that it did not lock, (Bloom Dep. at 30:12-15), and Mullane entered the vehicle

in order to secure it so that Plaintiff would not lose any property left in the car. (Mullane Dep. at 19:24-20:2; Police Report at 2.)  Finally, although Mullane found several items in Plaintiff's vehicle and recorded these his police report, Mullane did not remove, seize or otherwise disturb any items therein. (Bloom Dep. at 32:17-18.)

The Connecticut Supreme Court have held not only that caretaking procedures, such as the ones at issue here, are constitutional, but also that evidence of a crime accidentally discovered during such a search need not be suppressed.[13] Tully, 166 Conn. at 137 (citing United States v. Fuller, 277 F. Supp. 97, 100 (D.D.C. 1967)).  This case is a civil case unrelated to the underlying criminal action and therefore, there is no claim here that evidence should be suppressed. Moreover, Plaintiff does not argue that evidence was used against him in his criminal action that should have been suppressed.  As such, the Court cannot find that Plaintiff's rights under article first, sections 7 and 9 of the Connecticut Constitution, the Fourth and Fourteenth Amendments to the United States Constitution, or his right to privacy were violated by the search.  Accordingly, summary judgment is granted on Counts One, Two and Six to the extent that they are predicated on the search of Plaintiff's vehicle.

<em>c.    Assault and Battery</em>

Defendants do not specifically brief this issue and therefore, summary judgment will not be entered on Plaintiff's assault and battery claim (Count Five).

3.    <u>Miranda Violation</u>

Count Two of Plaintiff's Complaint alleges, pursuant to 42 U.S.C. § 1983, that Defendant

---

[13]    The typical remedy for an unlawful search and seizure is the suppression, at the arrestee's criminal trial, of the "fruits" of the unlawful search.

Mullane deprived him of his liberty without due process of law and thus violated his rights under the Fifth and Fourteenth Amendments to the United States Constitution when Plaintiff was taken into custody and not notified of his Miranda rights.[14]

It is well-established that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." Miranda v. Arizona, 384 U.S. 436, 444, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).  The Supreme Court has defined "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Id.  As the Supreme Court has stated more recently, the Miranda rule is a prophylactic rule and as such, a failure to warn is not, in and of itself, a constitutional violation:

> the Miranda rule is a prophylactic employed to protect against violations of the Self-Incrimination Clause. . . . And just as the Self-Incrimination Clause primarily focuses on the criminal trial, so too does the Miranda rule. The Miranda rule is not a code of police conduct, and police do not violate the Constitution (or even the Miranda rule, for that matter) by mere failures to warn.

United States v. Patane, 542 U.S. 630, 636-37, 124 S. Ct. 2620; 159 L. Ed. 2d 667 (2004). Potential violations occur, if at all, only upon the admission of unwarned statements into evidence at a defendant's criminal trial, and the exclusion of such statements is a complete, sufficient and exclusive remedy for any Miranda violation. Id. at 641-42.

In the present case, it is irrelevant whether Plaintiff was advised of his Miranda rights

---

[14]     In Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), the Supreme Court held that a suspect must be warned prior to questioning that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.

prior to any custodial interrogation.  Any potential violation cannot give rise to an actionable

claim.  As such, Defendants are entitled to judgment as a matter of law on Plaintiff's claim that

his rights were violated by Mullane's failure to give <u>Miranda</u> warnings.

### B.    42 U.S.C. § 1983 Claim Against the Town

Count Two of Plaintiff's Complaint also alleges that Defendant Town of Stratford

violated 42 U.S.C. § 1983 by: (1) maintaining policies of failing to adequately train, supervise

and control officers in investigation and arrest procedures; (2) knowingly, recklessly or

negligently failing—through its policies and customs—to instruct, supervise or control Officer

Mullane; and (3) approving and/or ratifying the actions of Officer Mullane.

A municipal agency may not be held liable under § 1983 simply for the isolated

unconstitutional acts of its employees; it is only "when execution of a government's policy or

custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to

represent official policy, inflicts the injury that the government as an entity is responsible under §

1983." <u>Monell v. Dep't of Soc. Servs.</u>, 436 U.S. 658, 694, 56 L. Ed. 2d 611, 98 S. Ct. 2018

(1978) (rejecting respondeat superior as a basis of § 1983 liability); <u>see also</u> <u>Bd. of County</u>

<u>Comm'rs v. Brown</u>, 520 U.S. 397, 399, 403, 117 S. Ct. 1382, 137 L. Ed. 2d 626 (1997) (stating

that "in enacting § 1983, Congress did not intend to impose liability on a municipality unless

deliberate action attributable to the municipality itself is the 'moving force' behind the plaintiff's

deprivation of federal rights," and holding that "a municipality may not be held liable under §

1983 solely because it employs a tortfeasor").  In order to hold a municipality liable under 42

U.S.C. § 1983, Plaintiff must "plead and prove three elements: (1) an official policy or custom

that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right."  <u>Zahra v.</u>

Town of Southold, 48 F.3d 674, 685 (2d Cir. 1995) (quoting Batista v. Rodriguez, 702 F.2d 393,

397 (2d Cir. 1983), additional citations omitted).  Summary judgment is appropriate when a

plaintiff fails to present any evidence or allegation of an official policy.  See Sagendorf-Teal v.

County of Rensselaer, 100 F.3d 270, 277 (2d Cir. 1996).

Such a municipal policy need not be express; the policy or custom may be inferred from

the informal actions or omissions of supervisory municipal officials.  Turpin v. Mailet, 619 F.2d

196, 200 (2d Cir.), cert. denied, 449 U.S. 1016, 101 S. Ct. 577, 66 L. Ed. 2d 475 (1980).

Accordingly, "municipal inaction such as the persistent failure to discipline subordinates who

violate [a person's] civil rights could give rise to an inference of an unlawful municipal policy of

ratification of unconstitutional conduct." Batista, 702 F.2d at 397; see also Sorlucco v. New York

City Police Dep't, 971 F.2d 864, 870-71 (2d Cir. 1992) ("So long as the discriminatory practices

of city officials are persistent and widespread, they 'could be so permanent and well settled as to

constitute a custom or usage with the force of law,' and thereby generate municipal liability.")

(quoting Monell, 436 U.S. at 691).  Before the actions of a subordinate city employee could give

rise to § 1983 liability, however, "the discriminatory practice must be so manifest as to imply the

constructive acquiescence of senior policy-making officials."  Sorlucco, 971 F.2d at 871 (citing

Praprotnik, 485 U.S. at 130; Krulik v. Board of Educ. of the City of New York, 781 F.2d 15, 23

(2d Cir. 1986)).  A municipality thus becomes accountable for acquiescing in a "custom" only

when it knowingly tolerates a pattern or practice of unconstitutional conduct.

To establish a municipal policy of failing to properly train and/or supervise police

officers, Plaintiff "must put forward some evidence that the City itself has acted or consciously

not acted," alleging "actual conduct by a municipal policymaker," i.e., an official who is

"relatively high up in the municipal hierarchy." Walker v. New York, 974 F.2d 293, 296-97 (2d

Cir. 1992) (citing Oklahoma City v. Tuttle, 471 U.S. 808, 85 L. Ed. 2d 791, 105 S. Ct. 2427

(1985); Pembaur v. Cincinnati, 475 U.S. 469, 89 L. Ed. 2d 452, 106 S. Ct. 1292 (1986); St. Louis

v. Praprotnik, 485 U.S. 112, 99 L. Ed. 2d 107, 108 S. Ct. 915 (1988)).   In City of Canton v.

Harris, 489 U.S. 378, 103 L. Ed. 2d 412, 109 S. Ct. 1197 (1989), the Supreme Court held that a

municipality will be held liable for failure to properly train only where "the failure to train

amounts to deliberate indifference to the rights" of those with whom municipal employees will

come into contact. Id. at 388-89 (explaining that "deliberate indifference" required that city

policymakers made a "deliberate choice . . . from among various alternatives" not to fully train

employees).

     The Second Circuit has set out three requirements plaintiffs must meet in order to

establish that a municipality's failure to train or supervise constitutes deliberate indifference to

the constitutional rights of its citizens: (1) "the plaintiff must show that a policymaker knows 'to

a moral certainty' that her employees will confront a given situation;" (2) "the plaintiff must

show that the situation either presents the employee with a difficult choice of the sort that

training or supervision will make less difficult or that there is a history of employees mishandling

the situation;"[15] and (3) "the plaintiff must show that the wrong choice by the city employee will

frequently cause the deprivation of a citizen's constitutional rights." Walker, 974 F.2d at 297-98.

     First, Plaintiff contends that Mullane's arrest report was not reviewed and counter-signed

by a superior as required by police department procedures. (Pl.'s Opp. 25.)  Plaintiff has not

---

[15]     The Walker court noted that a "difficult choice" is one that "requires more than the application of
common sense," or "where, although the proper course is clear, the employee has powerful
incentives to make the wrong choice." 974 F.2d at 297.

established, however, that a review and signature is required.  Moreover, a review of the police

report indicates that, on the date of Plaintiff's arrest, a reviewing officer, identified by

Defendants as Stratford Police Sergeant Patrick Freer, signed and notarized each page of the

report. (See Police Report, Oct. 17, 2003, Ex. G to Pl.'s Opp.)

Second, Plaintiff contends that Mullane was never informed that a metal detector is legal

to own and operate. (Pl.'s Mem. 25.)  Defendants do not contend, however, that the use of the

metal detector in and of itself was illegal, but that Plaintiff's use of the device, combined with his

prior destructive conduct, constituted disorderly conduct.  Moreover, to make this factor relevant,

Plaintiff would also have to establish that a policymaker knew to a "moral certainty" that police

officers would confront situations involving metal detectors, that the situations would present the

officers with a "difficult choice," and that the wrong choice would "frequently cause the

deprivation of a citizen's constitutional rights." Walker, 974 F.2d at 297-98.  Those elements

have not been established here.

Third, Plaintiff argues that Sarris's and Mullane's failure to advise him of his Miranda

rights is indicative of a lack of proper training and supervision. (Pl.'s Opp. 25.)  As discussed

above, however, Miranda warnings are only necessary prior to custodial interrogation.  Plaintiff

has not presented any evidence to show that Mullane interrogated, or attempted to interrogate,

Plaintiff.  Moreover, no statements, whether voluntary or involuntary, were used against Plaintiff

in any proceeding.  As such, the fact that Plaintiff may not have been advised of his rights until

he arrived at the police station is not indicative of a lack of proper training and/or supervision.

Fourth, Plaintiff contends that the Town should not have permitted Plaintiff's disorderly

conduct charge to be prosecuted "when they knew it was without merit," based on the testimony

22

of Bessie Burton, the curator and director of volunteers at the Park, at Plaintiff's November 21,

2003 trial that she "didn't care if" Plaintiff was using the metal detector, but "[d]igging the holes

is another matter." (Pl.'s Opp. 25 (citing Trial Trans. at 16:5-9, Nov. 21, 2003, Ex. H to Pl.'s

Opp.).)  This allegation fails, however, because the police have no authority to prevent a

prosecution from going forward after it has been turned over to the prosecutors.

Finally, Plaintiff claims that after he was released from custody on October 17, 2003, a

desk sergeant told him not to metal detect in the Park. (Pl.'s Opp. 26.)  Plaintiff alleges that this

statement is indicative of the Town ratifying Mullane's conduct and becoming "complicit" in

"Mullane's personal vendetta and desire to illegally prevent [Plaintiff] from going to [the Park]

and possess and use his metal detector." (Id.)  This theory, however, is not founded on any

evidence of such a policy or custom.

In sum, Plaintiff has not presented evidence sufficient to establish that a policymaker for

the Town knew "to a moral certainty" that police officers would confront the situation at issue

here, that the situation presented officers with a difficult choice or that there is a history of

officers mishandling similar situations, or that the wrong choice will frequently deprive citizens

of their constitutional rights.  Plaintiff's assertions, discussed above, are irrelevant to this

determination and without merit.  Accordingly, Defendants' are entitled to judgment on

Plaintiff's § 1983 claims against the Town.

### C.    State Law Intentional Infliction of Emotional Distress Claim (Count Eight)

Count Eight of Plaintiff's Complaint alleges that "Defendant Mullane's conduct was

extreme and outrageous and he knew, intended or should have known that emotional distress was

a likely result," and that "Defendant Mullane's actions have severely injured and embarrassed

23

[Plaintiff] to such a degree as to cause him anxiety, worry and other physical and emotional symptoms."  Plaintiff's claim for intentional infliction of emotional distress arises under state law.  In order to hold Defendant liable for intentional infliction of emotional distress, Plaintiff must establish: "(1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe." Appleton v. Board of Educ., 254 Conn. 205, 210, 757 A.2d 1059 (2000) (quoting Petyan v. Ellis, 200 Conn. 243, 253, 510 A.2d 1337 (1986)).

An intentional infliction of emotional distress claim requires conduct that exceeds "all bounds usually tolerated by decent society . . . ." Petyan, 200 Conn. 254 n.5, quoting W. Prosser & W. Keeton, Torts (5th Ed. 1984) § 12, p. 60.  As discussed in the Restatement:

> The cases thus far decided have found liability only where the defendant's conduct has been extreme and outrageous. It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

Restatement (Second) of Torts § 46 cmt. d (1965).  A defendant's conduct that is "merely insulting or displays bad manners or results in hurt feelings" is insufficient to form the basis of an intentional infliction of emotional distress claim. Appleton, 254 Conn. at 211 (quoting Mellaly v. Eastman Kodak Co., 42 Conn. Supp. 17, 19, 597 A.2d 846 (1991)).  Even assuming that the first

and third prongs have been met in this case—which is far from clear—it has not been shown that Defendant's conduct was either extreme or outrageous, or that Plaintiff suffered severe emotional distress.

### 1.      Extreme and Outrageous Conduct

Plaintiff argues that Mullane arrested Plaintiff based on a "personal vendetta" against Plaintiff, and as a way to "unlawfully prevent [Plaintiff] from pursuing lawful actions in a public park in the future." (Pl.'s Opp. 41.)  In his deposition, Plaintiff testified that Mullane was "reacting to a personal vendetta" based on the fact that on the prior day, Plaintiff had examined Mullane on the witness stand when he appeared *pro se* to defend himself in the state criminal action arising from the May 17, 2003 infraction. (Bloom Dep. at 52:12-53:12.)  Plaintiff testified that he believes that Mullane was "reacting to a personal vendetta" based on Plaintiff's impression that Mullane "did not enjoy it" and "may have resented it" when Plaintiff examined him on the witness stand. (Id. at 52:12:-22.)  Plaintiff testified that Mullane "did not look relaxed" on the witness stand. (Id. at 53:9-10.)  Plaintiff also testified that the fact that Mullane took over the investigation from Officer Sarris when he arrived at the Park on October 17 indicated that Mullane had a personal vendetta against him. (Id. at 54:3-11.)  Plaintiff subsequently admitted, however, that Mullane had background information regarding Plaintiff's prior incident. (Id. at 54:12-18.)  Finally, Plaintiff testified that "[t]he fact that [Mullane] arrested [him] without hesitation" indicated that Mullane might have a personal vendetta against him. (Id. at 54:19-25.)

Plaintiff cites Jezierny v. Brown, No. CV04084755S, 2005 Conn. Super. LEXIS 2505, 2005 WL 2496525 (Conn. Super. Ct. Aug. 24, 2005), in support of his argument that Mullane's

conduct was "extreme and outrageous."  In that case, the plaintiff's allegations of extreme and

outrageous conduct included:

> (1) making false complaints to the police to the effect that the plaintiff was
> continuously calling his house to harass him; (2) claiming these calls were made at
> all times of the day and on many different days when the plaintiff never made these
> calls; and (3) requesting the police arrest the plaintiff. As a result of this conduct, the
> plaintiff alleges that she was required to appear in court several times and to defend
> herself in a trial before the court in which she was found not guilty.

Jezierny, 2005 WL 2496525, at *3.  The Connecticut Superior Court found, on a motion to strike

the claim of intentional infliction of emotional distress, that the claim was legally sufficient, and

stated that "to bring the weight of a criminal prosecution on the shoulders of the plaintiff and to

use the criminal justice system to achieve a vindictive goal rises to the level of extreme and

outrageous conduct by the defendant." Id.

This case is distinguishable on several grounds.  First, there is no evidence here that

Mullane made a false complaint or presented any false information to prosecutors.  Second, the

posture of this case is different.  Whereas Jezierny involved a motion to strike, such that the

plaintiff's allegations were accepted as true, this case involves a motion for summary judgment,

where Plaintiff must set forth admissible evidence to support his claim of extreme and

outrageous conduct.  Although Plaintiff testified that he believes that Mullane had a "personal

vendetta" against him, he has set forth no convincing evidence in support of that assumption.

In Ancona v. Manafort Bros., 56 Conn. App. 701, 746 A.2d 184 (2000), the Connecticut

Appellate Court found that the plaintiff did not set forth a viable claim of intentional infliction of

emotional distress.  In that case, the plaintiff's claim of intentional infliction of emotional

distress was based on the allegation that the defendant commenced its breach of contract action

without probable cause. Id. at 711.  The plaintiff argued that both the filing of the underlying

action and the defendant's actions in collecting the debt–i.e., the defendant's "failure to abide by

its oral promise to forward a contract with a $185 monthly charge, its shadowy procurement of

the plaintiff's final check, its issuance of an exorbitant and unitemized demand letter, its filing of

a prejudgment remedy application with accompanying affidavit that failed to disclose relevant

facts, the later withdrawal of the prejudgment remedy application and its initiation and pursuit of

its breach of contract action"—constituted extreme and outrageous conduct. Id. at 712-13.  The

court held that "[e]ven assuming the conduct of the defendant was as characterized and listed by

the plaintiff," the plaintiff had failed to establish that the conduct at issue was extreme and

outrageous, and therefore concluded that the trial court did not err in granting summary judgment

on the plaintiff's intentional infliction of emotional distress claim. Id. at 713.

Although there is a question whether Plaintiff's arrest was based on probable cause, the

evidence set forth does not establish that Mullane's conduct in this case "has been so outrageous

in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be

regarded as atrocious, and utterly intolerable in a civilized community." Restatement (Second) of

Torts § 46 cmt. d (1965).  As such, summary judgment is proper on Plaintiff's intentional

infliction of emotional distress claim.

### 2.   Severe Emotional Distress

Even if the conduct alleged was found to be "extreme and outrageous," Plaintiff has

failed to show that he suffered "severe emotional distress" as required to prove a claim for

intentional infliction of emotional distress.  Plaintiff testified in his deposition that as a result of

Defendant Mullane's actions, he suffered insomnia, anxiety, heartburn and anger. (Id. at 51:23-

27

52:7.)  Plaintiff has not, however, received any medical attention for these alleged injuries. (Id. at

51:15-22.)  Plaintiff's statements are the only evidence in the record regarding any alleged

emotional or psychological impact of Defendant Mullane's actions.

Several courts, applying Connecticut law, have held that emotional distress is severe

when it reaches a level which "no reasonable person could be expected to endure." Almonte v.

Coca-Cola Bottling Co., 959 F. Supp. 569, 575 (D. Conn. 1997) (citing Mellaly v. Eastman

Kodak, 42 Conn. Supp. 17, 597 A.2d 846, 848 (Conn. Super. Ct. 1991)).  It is unclear whether a

plaintiff must seek treatment in order to maintain a claim of intentional infliction distress under

Connecticut law. See Almonte, 959 F. Supp. at 575 (citing Rosenberg v. Hebrew Home and

Hosp., No. CV 33 31 35, 1997 Conn. Super. LEXIS 168, 1997 WL 35808, *2 (Conn. Super. Ct.

Jan. 23, 1997) and Reed v. Signode Corp., 652 F. Supp. 129, 137 (D.Conn. 1986)).  Regardless

of whether a plaintiff must seek treatment or not, it does not appear that Plaintiff's emotional

distress was "severe," at a level which "no reasonable person could be expected to endure," or

that he experienced his symptoms "to an extraordinary degree." See Almonte, 959 F. Supp. at

575 (granting summary judgment on the plaintiff's claim of intentional infliction of emotional

distress on the ground that plaintiff failed to set forth any evidence indicating that he suffered his

symptoms—i.e., sleeplessness, depression and anxiety—"to an extraordinary degree"); Reed, 652

F. Supp. at 137 (granting summary judgment on the plaintiff's claim of intentional infliction of

emotional distress and noting that "plaintiff was neither treated nor did he seek medical

assistance for the distress he allegedly suffered").  Plaintiff, in his Complaint, alleges that he was

"severely injured and embarrassed," however, "merely alleging 'extreme emotional distress'

unsupported by factual allegations is legally insufficient." Macdonald v. Howard, No.

28

CV000176368S, 2000 Conn. Super. LEXIS 2791, 2000 WL 1687119, *1 (Conn. Super. Ct. Oct. 17, 2000) (citing Hart v. Mill Plain Autobody, No. 353463, 1999 Conn. Super. LEXIS 3261 (Conn. Super. Ct. Dec. 3, 1999)).

This Court finds that Plaintiff has not set forth sufficient evidence to maintain a claim of intentional infliction of emotional distress. Summary judgment is granted on Count Eight of Plaintiff's Complaint.

**D.     State Law Negligent Infliction of Emotional Distress Claim (Count Seven)**

Count Seven of Plaintiff's Complaint alleges that "Defendant Mullane knew or should have known that his conduct created an unreasonable risk of causing emotional distress to [Plaintiff] which if caused might result in illness or bodily harm," and that "Defendant Mullane's actions have severely injured and embarrassed [Plaintiff] to such a degree as to cause him anxiety, worry and other physical and emotional symptoms." This claim also arises under state law.

To prevail on a claim of negligent infliction of emotional distress, Plaintiff must prove that Defendant Mullane should have (1) realized that his conduct involved an unreasonable risk of causing emotional distress to Plaintiff and that (2) such distress, if caused, would be severe enough that it might result in illness or bodily harm. Carrol v. Allstate Ins. Co., 262 Conn. 433, 444, 446, 815 A.2d 119 (2003); Montinieri v. Southern New England Telephone Co., 175 Conn. 337, 345, 398 A.2d 1180 (1978). There are two significant differences under Connecticut law between claims for emotional distress based on negligent conduct and those based on intentional conduct. First, a plaintiff claiming negligent infliction of emotional distress is not required to demonstrate that he suffered severe emotional distress, as is necessary to sustain a claim for

29

intentional infliction of emotional distress; he must show only that he suffered "some emotional distress." Silberberg v. Lynberg, 186 F. Supp. 2d 157, 177 (D. Conn. 2002).  Second, whereas a claim based on intentional conduct requires that the defendant's conduct be "extreme and outrageous," a claim based on negligent conduct "requires only that the actor's conduct be unreasonable and create an unreasonable risk of foreseeable emotional harm." Olson v. Bristol-Burlington Health Dist., 87 Conn. App. 1, 7, 863 A.2d 748 (2005).  As noted by Justice Borden in Caroll, this creates a somewhat anomalous situation in which the burden of surmounting the behavioral bar is higher for a plaintiff attempting to prove intentional infliction of emotional stress than for one seeking redress for negligent infliction of emotional distress. Carrol, 262 Conn. at 452 (Borden, J., concurring).[16]

In Carrol, the plaintiff set forth evidence showing that the defendant conducted an arson investigation to establish whether the plaintiff had engaged in conduct that was criminal, and evidence from which the jury could have inferred that the defendant's investigation was not only shoddy, but also was possibly influenced by racial stereotypes.  The court concluded that this evidence was sufficient "to support a finding that the defendant's conduct created an unreasonable risk of causing the plaintiff's emotional distress and that the plaintiff's distress was foreseeable." Carrol, 262 Conn. at 447-48.

Although Plaintiff did not set forth evidence sufficient to sustain his claim of intentional infliction of emotional distress, the Court finds that there are material issues of fact in dispute

---

[16]     With respect to this apparent anomaly, the Olson court noted that "a defendant found culpable for intentional infliction of emotional harm is susceptible to punitive damages while a negligent defendant causing foreseeable emotional harm is liable only for compensatory damages," and therefore, "while a successful plaintiff must prove more egregious behavior in an intentional case than in one founded solely on negligence, the plaintiff's potential recovery in an intentional case is correspondingly greater." Olson, 87 Conn. App. at 8 n.2.

30

with regard to his claim of negligent infliction of emotional distress.  Specifically, there is an issue of fact as to whether Mullane had probable cause to arrest Plaintiff and whether he acted too quickly and/or carelessly in doing so.  Moreover, Plaintiff has set forth evidence indicating that he suffered "some emotional distress."  There is evidence from which a jury could find that Mullane breached a duty to care to Plaintiff, and in doing so, caused Plaintiff some foreseeable harm.  On the facts found here, a reasonable jury could find that Defendant Mullane should have (1) realized that his conduct involved an unreasonable risk of causing emotional distress to Plaintiff and that (2) such distress, if caused, would be severe enough that it might result in illness or bodily harm.  Accordingly, summary judgment will not be granted on Plaintiff's claim of negligent infliction of emotional distress (Count Seven).

### E.     Indemnification

Counts Nine and Ten of Plaintiff's Complaint allege that the Town is required to indemnify Defendant Mullane pursuant to Connecticut General Statutes §§ 7-465 and 7-101a. These provisions provide indemnity to a municipal employee for the legal liability arising out of his or her tortious conduct.[17]  As the Connecticut Supreme Court has stated, "[t]he obligation

---

[17]     Specifically, § 7-101a provides that municipalities "shall protect and save harmless . . . any municipal employee . . . from financial loss and expense, including legal fees and costs, if any, arising out of any claim, demand, suit or judgment by reason of alleged negligence, or for alleged infringement of any person's civil rights," or "by reason of alleged malicious, wanton or wilful act or ultra vires act on the part of such officer or such employee while acting in the discharge of his duties," however, "[i]n the event such . . . employee has a judgment entered against him for a malicious, wanton or wilful act in a court of law, such municipality shall be reimbursed by such officer or employee for expenses it incurred in providing such defense and shall not be held liable to such officer and employee for any financial loss or expense resulting from such act."

Section 7-465 provides indemnity to a municipal employee for "all sums which such employee becomes obligated to pay by reason of the liability imposed upon such employee by law for damages awarded for infringement of any person's civil rights or for physical damages to person or property . . . if the employee, at the time of the occurrence, accident, physical injury or damages complained of, was acting in the performance of his duties and within the scope of his

31

imposed by th[ese] statute[s] is indemnification for the legal liability arising out of certain tortious conduct of the municipal employee," and the municipality's liability under these statutes is derivative. Ahern v. New Haven, 190 Conn. 77, 82, 459 A.2d 118 (1983). The statutes impose no independent liability on the municipality itself. See id.; accord Thomas v. Commerford, 28 Conn. Supp. 506, 268 A.2d 413 (1970) (holding that § 7-465 "imposes a statutory obligation of indemnification," and does not impose "liability upon a municipality for breach of any statutory duty").

Although Defendant Mullane, if found liable to Plaintiff, can either (1) pay the judgment and request reimbursement from the Town or (2) request the Town to pay the judgment in his behalf pursuant to §§ 7-101a and 7-465, see Ahern, 190 Conn. at 81-82, these provisions do not give Plaintiff any independent right of action against the Town. Accordingly, summary judgment will be entered on Counts Eight and Nine of Plaintiff's Complaint.

## III.    CONCLUSION

For the reasons stated herein, Defendants' Motion for Summary Judgment [Doc. No. 33] is **granted in part** and **denied in part**.

SO ORDERED.

Dated at New Haven, Connecticut, November  16 , 2006.

/s/
_____
Peter C. Dorsey, United States District Judge
District of Connecticut

_____

employment, and if such occurrence, accident, physical injury or damage was not the result of any wilful or wanton act of such employee in the discharge of such duty."